**Steven LARSEN and Kimberly Larsen, Plaintiffs,**

v.

**CARNIVAL CORP., INC., et al., Defendant.**

**No. 02–20218–CIV–GRAHAM.**

United States District Court, S.D. Florida, Miami Division.

Jan. 24, 2003.

Robert Cary Maland, Miami, FL, Matthew Wilson Dietz, Matthew W. Dietz, Coral Gables, FL, for Steven Larsen, Kimberly Larsen, his wife plaintiffs.

Thomas Richard Julin, Ted Christopher Craig, Dorothy Patricia Wallace, Christina T. Ng, Hunton & Williams, Miami, FL, Carolyn Doppelt Gray, Michael B. Lehrhoff, Epstein Becker & Green, Washington, DC, for Carnival Corp., defendant.

Richard Randall McCormack, Mark Gerard Keegan, Hayden & Milliken, Coral Gables, FL, Henry H. Bolz, III, Keller & Bolz, Miami, FL, for Hallmark Reporting dba Hallmark Stevedoring Company, defendant.

## *ORDER*

GRAHAM, District Judge.

**THIS CAUSE** came before the Court upon the Defendant's Motion for Summary Judgment (D.E.68) and Plaintiffs' Motion for Partial Summary Judgment (D.E.64).

**THE COURT** has considered the motions, the pertinent portions of the record, and is otherwise fully advised in the premises.

## I. *FACTUAL BACKGROUND*

At the heart of this case, involving claims under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12182, *et seq.* ("ADA"), is a dispute over the medical disembarkation of Plaintiff Steven Larsen from one of Carnival's cruises on January 22, 2001. Since 1989, Steven Larsen has been a paraplegic and utilizes a motorized wheelchair. Since 1997, Steven Larsen was diagnosed with severe obstructive sleep apnea, severe morbid obesity at approximately 450 lbs., and chronic obstructive pulmonary disease, and has utilized a prescribed Bi–Pap ventilator ("Bi–Pap") and oxygen concentrator at night to help him breathe during sleep. *See* Deposition Transcript of Dr. Dan Vardi ("Dr. Vardi Dep.") at 6; Deposition Transcript of Steven Larsen ("Larsen

Dep.") at 68, 70; Deposition Transcript of Dr. Rodney Benjamin ("Dr. Benjamin Dep.") at 8, 21. Mr. Larsen's obstructive sleep apnea is so severe that according to his primary treating physician, Dr. Vardi, Steven Larsen has "the most complex case that [one] can possibly have." Dr. Vardi Dep. at 51–52.

In order to treat Steven Larsen's severe obstructive sleep apnea, Dr. Vardi testified that the prescribed therapy for Mr. Larsen's pulmonary difficulties is the use of a Bi–Pap ventilator machine in conjunction with an oxygen concentrator. See Dr. Vardi Dep. at 18–19. The Bi–Pap utilized by Steven Larsen is an expensive prescription device that facilitates breathing by forcing bi-level pressure into the lungs in order to prevent the patient from stopping breathing through upper airway obstruction. See Dr. Benjamin Dep. at 15; Dr. Vardi Dep. at 14–15.

During his deposition, Dr. Vardi, Plaintiff's treating physician, elaborated that "[m]ost of the time, I'd rather—I'd rather that he use both [the Bi–Pap and the oxygen concentrator.] It's better for him to use both of them all the time. At night. Every night." Dr. Vardi Dep. at 30. Dr. Vardi further testified that he never recommended to Steve Larsen that it was acceptable to simply use the concentrator instead of the Bi–Pap at night. See Dr. Vardi Dep. at 30.

Dr. Vardi has never advised Steven Larsen that it is safe or acceptable for him to go even one night without a functioning Bi–Pap or oxygen concentrator. Indeed, Dr. Vardi stated at his deposition that "I cannot say for sure that it is safe. This is a toss of a coin. When he is absolutely okay and doesn't have any infection, he could probably get by. But to say it's safe, it's a stretch." Id. at 59.

Specifically, Dr. Vardi testified that Steven Larsen is at higher risk for respiratory failure than most other patients when he has an infection or is having difficulty breathing and his Bi–Pap ventilator is not available to him. See id. at 38. One of the risks of respiratory failure for Steven Larsen is death. Id. Steven Larsen has been advised and is fully aware that during such times when he is not well physically, he may suffer respiratory failure, and may die if he does not use his Bi–Pap at night. See id. at 49–50.

In September 2000, Plaintiffs Steven and Kimberly Larsen sailed as cruise passengers—without incident—on the M/S Ecstasy to Key West, Florida and Cozumel, Mexico. See Deposition Transcript of Kimberly Larsen ("K. Larsen Dep.") at 47. For that trip, the Larsens checked in the Bi–Pap machine with the curbside porter. Based upon their positive experience with Carnival on the September 2000 cruise, the Larsens decided to purchase tickets for another trip on the M/S Ecstasy for the same itinerary in January 2001. See Larsen Dep. at 130–131.

Prior to the January 2001 trip, Steven Larsen submitted a Special Requirements Information form to Carnival indicating, among other things, that he was a paraplegic, that he utilized an electric wheelchair, that the width of his electric wheelchair was 28½ inches, and that he utilized a "Bi Pap." See Appendix to Defendant's Statement of Undisputed Facts ("Appendix"), Tab 7. In making arrangements in preparation for the January 2001 trip, Steven Larsen spoke with Carnival representatives and was informed of the dimensions of his modified, wheelchair-accessible cabin. See Larsen Dep. at 141.

Kimberly Larsen packed the Bi–Pap for the January 2001 cruise in the same way

she had packed it for the September 2000 trip, by wrapping it in a towel and placing it in a soft duffel bag. Kimberly Larsen advised the porter of the fragile contents of the bag, and requested to carry it on board with her. *See* K. Larsen Dep. at 54–55. As with the September 2000 cruise, the Larsens checked in their Bi–Pap for the January 2001 cruise by giving it to the curbside porter, after they were told they could not bring it on board with them. *Id.* Carnival does not dispute that the Larsens were erroneously advised by the curbside porter regarding Carnival's policy of allowing guests to carry on medical equipment with them. The parties do dispute, however, whether the curbside porters assisting Carnival with the boarding of Carnival passengers onto Carnival vessels were employees or agents of Carnival.

Upon boarding the vessel and during the check-in process, the Larsens were separated briefly; Steven Larsen was taken up the elevator to the second floor, while Kimberly Larsen walked up the stairs with other able-bodied passengers. Steven Larsen did not need any medical assistance or care from Kimberly Larsen during the time that they were separated. *See* Larsen Dep. at 153–155.[1]

Once they boarded the ship, the Larsens immediately went to their assigned modified cabin for the disabled, Cabin E–116, located along the same row of cabins as the rest of the Larsens' traveling party, except for Mr. Larsen's daughter, who made her booking late. *See* Larsen Dep. at 140–141. This modified room, however, was not accessible to Steven Larsen.

Around noon, the Larsens informed the purser's desk that the cabin in which they were originally booked was not accessible to Steven Larsen. *See* Larsen Dep. at 160–162. The purser's desk advised the Larsens that they would attempt to locate a larger modified cabin for them, but had to first determine if the other guests assigned to the cabin needed a modified cabin themselves. *Id.*[2] The Larsens claim they were told that if no accessible cabin was available, they would be required to disembark the ship. Larsen Dep. at 160.

Carnival located another cabin for the Larsens within about half an hour of the Larsens' request for a different cabin, and paged the Larsens at least twice through the ship's public announcement system to ask them to come to the purser's desk so they could be informed regarding the cabin reassignment. *See* Haughey Dep. at 58–60. The Larsens, for their part, claim that they were not assigned another room until at least 3:30 p.m., nearly four hours after notifying the purser of their needs.

Steve Larsen knew that there were wheelchair accessible restrooms available

---

1. During times when it is extremely crowded during the guest check-in process at the terminal, Carnival's policy is to take the wheelchair guests on the elevators up to the passenger gangway first and request that the wheelchair guest's family remain in line, and meet the wheelchair guests when they reach the second level. Deposition Transcript of Kathy Williams ("Kathy Williams Dep.") at 32–33. This is done in consideration of other guests who are further ahead and might resent having family members of wheelchair guests jump in front of them in line. *Id.*

2. If passengers in modified cabins are not disabled, it is Carnival's policy to relocate those non-disabled guests and give the modified cabin to the disabled passenger. *See* Strawderman Dep. at 69–70. Passengers who are booked into modified cabins are notified that they may be relocated at the time of booking if a disabled guest needs the cabin. *Id.*

in the terminal used by the Larsens to board the M/S Ecstasy at the Port of Miami. Steve Larsen did not, however, ask anyone if he could use the terminal restrooms, or any other restroom. *See* Larsen Dep. at 165–166. Kimberly Larsen contends that although Steve Larsen did not indicate any immediate need to use the restroom, she knew it was getting "pretty close to the time." *See* K. Larsen Dep. at 63. Kimberly Larsen claimed she and her husband asked if there were other restrooms, but was advised that "there were only handicapped bathrooms in the handicap rooms." *Id.* at 54. However, the Larsens did not specifically request to use any restroom, either on or off the vessel.

Around 3:30 to 4 p.m., the Larsens were successfully reassigned to Cabin M298, a wheelchair-accessible cabins. *See id.* at 160–161; Strawderman Dep. at 61. Cabin M298 had a larger entry doorway and interior cabin size, and the same décor as Cabin E116. *See id.* at 61.

The M/S Ecstasy was scheduled to sail at 4 p.m. on January 22, 2001. *See* Larsen Dep. at 167. At around 4:30–5 p.m., all the guests were onboard the ship and the passenger gangway through which the Larsens had originally boarded the ship was removed in preparation for departure. *See* Haughey Dep. at 45–46.

At around 4:30 p.m., half an hour after the ship was originally scheduled to set sail, Steven Larsen discovered that his Bi-Pap machine was not functioning properly, and went to the purser's desk to attempt to obtain a replacement Bi-Pap. *See* Larsen Dep. at 168–173. The Larsens did not know first-hand of any medical supply companies in Miami from where they could obtain a replacement Bi-Pap. *See* Larsen Dep. at 206–207.

Lincare, the medical supply company used by the Larsens for their Bi-Pap, is based in Port Charlotte, Florida and did not have an office in or provide service to Miami–Dade County. *See* Deposition Transcript of John Sims ("Sims Dep.") at 25. The nearest Lincare office to Miami is located in Pompano Beach, Broward County, and is approximately 40 miles away from the Port of Miami. Although Plaintiffs submit that Lincare could have packed and shipped a replacement ventilator to the ship during its stop in Key West, Florida the next morning, Tuesday, January 23, 2001, the earliest that Mr. Larsen's own medical supplier, Lincare, could deliver a replacement Bi–Pap machine to Key West was Wednesday morning, one day *after* the ship was scheduled to be in Key West. (Edmonds Dep. at Ex. A; Haughey Dep. at 26:17–28:5.) On Wednesday morning, January 24, 2001, the ship was in Cozumel, Mexico.

Upon learning that Steven Larsen needed a replacement ventilator, the purser directed Steven Larsen to discuss the matter with the ship's medical staff at the infirmary. *See* Larsen Dep. at 173–177. At the infirmary, Steven Larsen advised the nurse that his Bi–Pap ventilator was broken, and that he suffered from sleep apnea and required the Bi–Pap to sleep at night. *See* Deposition Transcript of Ruby Dyall ("Dyall Dep.") at 10–11. The infirmary did not carry any Bi–Paps and thus, could not provide Steven Larsen a replacement from the infirmary. *See* Haughey Dep. at 11.

At approximately 4:50–4:55 p.m., the nurse called the doctor and asked him to come down to the infirmary. *See* Deposition Transcript of Dr. Yusef Mahomedy ("Mahomedy Dep.") at 29. Minutes later, at approximately 5 p.m., the ship's doctor arrived in the infirmary and spoke with Steven and Kimberly Larsen. *Id.* He was

familiar with the medical condition of sleep apnea and the use of a Bi–Pap, but had not received specific training with respect to this condition. *Id.* 34,42.

The Larsens asked that Steven Larsen be permitted to sail one night without his Bi–Pap and requested that a replacement Bi–Pap be delivered the next morning in Key West. *See* K. Larsen Dep. at 79–80. Kimberly Larsen offered to sign a waiver of liability if Carnival would permit Steven Larsen to remain onboard the ship. *Id.* at 79. The ship's doctor, nurse and chief purser recall Kimberly Larsen trying to convince them to allow Steven Larsen to stay onboard the ship and saying that he had almost died on five prior occasions. *See* Mahomedy Dep. at 29–31; Haughey Dep. at 24; Dyall Dep. at 12. The ship's doctor, in agreement with the nurse, decided to disembark Steven Larsen for medical reasons. *See* Mahomedy Dep. at 30–31, 33. The ship's doctor believed that in the absence of a functioning ventilator machine, Steven Larsen was at risk of a medical emergency and potentially death. *See* Mahomedy Dep. at 34, 41–42; Dr. Benjamin Dep. at 19; Dyall Dep. at 15–31.

Dr. Vardi, Steven Larsen's treating physician, testified that would not have advised Steven Larsen to go on the cruise if he did not have a functioning Bi–Pap to take with him on the ship. *See* Dr. Vardi Dep. at 57–58. Indeed, Dr. Vardi testified that he believes the decision to disembark would be a medically reasonable response in a case where a Bi–Pap ventilator machine could not be supplied. As Dr. Vardi stated:

> "In a case it's unavailable, cannot supply it, it's reasonable, yes [to disembark the passenger]. As I said, it's much better for the patient, it's safer for him not to travel if he doesn't have the equipment."

Dr. Vardi Dep. at 70–71.

Carnival's infirmary procedures manual contains a form titled "Refusal of Medical Advice." Carnival's policy is not to *offer* or accept Refusal of Medical Advice forms where the passenger is at serious medical risk and allowing the passenger to sail would place the safety of the passenger, the ship and/or other passengers or crew-members at risk. *See* Deposition Transcript of Dr. Arthur Diskin ("Dr. Diskin Dep.") at 13–14.

Carnival's policy is that the ship's doctor has full discretion and authority to make any medical decisions on the ship, including whether to medically disembark and whether to offer or accept the Refusal Against Medical Advice form. *See id.* at 14–15, 22. In the absence or unavailability of the ship's doctor, a ship's nurse can make this decision. *See id.* at 12–13. The ship's captain does not have the authority to override or challenge the ship's doctor's decision to medically disembark a passenger. *See* Strawderman Dep. at 91.

Once the decision to medically disembark Steven Larsen was made, the Larsens were escorted to their cabin and asked to pack their belongings. Larsen Dep. at 194, 198. Carnival wanted to disembark Mr. Larsen as quickly as possible, since it was approximately 5:15 p.m. and the ship was ready to set sail and behind schedule. *See* K. Larsen Dep. at 85; Haughey Dep. at 37–38. Kimberly Larsen was never asked to disembark and in fact, was told that she could stay onboard the ship. *See* Haughey Dep. at 34; Dyall Dep. at 48.

After the Larsens were done packing their belongings, they were accompanied by the chief purser and several other Carnival employees to the crew gangway in order to disembark the ship, as the passenger gangway had been retracted in preparation for departure. *See* Haughey Dep. at 45; Larsen Dep. at 200.

As Steven Larsen traversed the crew gangway, Kimberly Larsen yelled that it

was unsafe for Steven Larsen to do so and threatened to sue Carnival if he fell. *See* K. Larsen Dep. 98–100. At that point, after Kimberly's warning, Carnival crewmembers took hold of Steven Larsen's wheelchair to assist him as he went down the crew gangway. *Id.* In the process of assisting Steven Larsen after Kimberly Larsen's warnings, Steven Larsen's wheelchair broke.

After disembarkation, the Larsens were taken into the Embarkation Office inside the terminal, and a call was made to Lincare, the Larsen's medical supply company in Port Charlotte, Florida, to attempt to have a replacement Bi–Pap delivered in either Key West or Miami. *See* K. Larsen Dep. at 108–110; Kathy Williams Dep. at 19. The Embarkation Staff attempted to find a way to have a replacement Bi–Pap delivered so that the Larsens could continue their trip with their friends and family. Larsen Dep. at 220; K. Larsen Dep. at 108–109.

The Larsens, however, did not consider boarding the ship in Key West with a new Bi–Pap, because they did not wish to drive down to Key West to meet the ship, and instead drove back home to Port Charlotte, Florida that evening. *See* Larsen Dep. at 224–226. In any event, due to inclement weather, the M/S Ecstasy did not sail to Key West, Florida the next day. As such, it is undisputed that the Larsens could not have possibly boarded the ship in Key West, nor could a Bi–Pap have been delivered to the ship in Key West. *See* Mahomedy Dep. at 49–50; Haughey Dep. at 48.

Although Plaintiffs have asserted claims under Title III of the ADA, it must be noted that on October 31, 2001, the Honorable Federico A. Moreno, United States District Judge, approved a class settlement in *Access Now, Inc. v. Cunard Line Limited, Co.*, No. 00–7233–Civ–Moreno, 2001 WL 1622015 (S.D.Fla.2001), for any claims based upon Title III of the ADA for the design, construction or physical accessibility of the M/S Ecstasy. Pursuant to this class settlement, Carnival agreed to make certain modifications to specified ships, including the M/S Ecstasy, in exchange for the class members releasing any and all claims under Title III of the ADA that refer or relate to the design, construction or physical accessibility of the specified ships. Settlement Agreement at 4.2. *See* Defendant's Appendix, Tab 18.

The Settlement Class includes, in relevant part, all Persons who have been or will qualify as having a "disability" as defined in 42 U.S.C. § 12102(2) and who have been or will be a guest on, or otherwise have been or will be adversely affected by the design, construction or physical accessibility of the specified ships, including the M/S Ecstasy. *See* Settlement Agreement at 1.1. Plaintiffs are members of the settlement class and cannot seek relief in the instant suit for claims encompassed by the Settlement Agreement, *e.g.*, claims involving the design, construction, or physical accessibility of the M/S Ecstasy.

## II. STANDARD OF REVIEW

The purpose of summary judgment is to determine "whether there is a need for trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court may grant summary judgment only if it appears through pleadings, depositions, admissions and affidavits that there is no "genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Real Estate Financing v. Resolution Trust Corporation,* 950 F.2d 1540, 1543 (11th Cir.1992); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1493 (11th Cir.1988), *cert. den.,* 490 U.S. 1084, 109 S.Ct. 2110, 104 L.Ed.2d 670 (1989). "The party seeking summary judgment bears the exacting burden of demonstrating that there is no genuine dispute as to any material fact in the case." *Clemons v. Dougherty County, Ga.,* 684 F.2d 1365, 1368 (11th Cir.1982)(citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

In making this determination, the Court must decide which issues are material. The Supreme Court has stated that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### III. DISCUSSION

#### A. The Title III "Reasonable Modification" Framework

Title III of the ADA was designed to provide disabled persons with meaningful access to places of public accommodation. To this end, Title III requires places of public accommodation to make "reasonable modifications" to their policies, practices or procedures when such modifications are necessary to afford individuals with disabilities the goods, services, facilities, privileges, advantages or accommodations being offered, unless doing so would fundamentally alter the nature of the goods or services so offered. *See* 42 U.S.C. § 12182(b)(2)(A)(ii).

■ In order to prevail under Title III of the ADA, a plaintiff generally has the burden of proving: 1) that he or she is an individual with a disability; 2) that defendant is a place of public accommodation; and 3) that defendant denied him or her full and equal enjoyment of the goods, services, facilities or privileges offered by defendant on the basis of his or her disability. *Access Now, Inc. v. South Fla. Stadium Corp.,* 161 F.Supp.2d 1357, 1363 (S.D.Fla.2001); *Tugg v. Towey,* 864 F.Supp. 1201, 1205 (S.D.Fla.1994).[3]

The Supreme Court has emphasized that in considering a "reasonable modification" claim, "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 688, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).

■ A plaintiff who alleges that a defendant failed to reasonably modify its policies, practices or procedures must show that he or she actually requested a modification that was necessary for full and equal enjoyment and that such a modification is reasonable in the run of cases. *Johnson v. Gambrinus Co./Spoetzl Brewery,* 116 F.3d 1052, 1058–60 (5th Cir.1997). If the plaintiff makes such a showing, the

---

**3.** The parties do not dispute that Plaintiff is an individual with a disability, or that the M/S Ecstasy operated by Carnival is a place of public accommodation.

burden then shifts to the defendant to offer rebuttal evidence that the modification is not reasonable in the run of cases. As part of this reasonableness inquiry, federal courts have considered the effectiveness or feasibility of the proposed modification and whether it imposes undue costs or administrative burdens on the defendant. *DeBord v. Board of Educ. of the Ferguson–Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir.1997); *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995).

■ At all times, however, plaintiff bears the ultimate burden of persuasion on the issue of reasonableness. *Johnson*, 116 F.3d at 1059. If, and only if, plaintiff meets this burden, defendant bears the burden of proving that under the particular circumstances, the requested modification would fundamentally alter the nature of the goods or services being offered. *Id.*[4]

### B. *Plaintiffs' Title III Claims*

In Count II of the Amended Complaint, Plaintiffs essentially contend that due to certain of Carnival's alleged operational policies, practices and procedures, they were unlawfully discriminated against based on Steven Larsen's disability and denied access to travel on the M/S Ecstasy. First, Plaintiffs maintain that Carnival failed to grant them a "reasonable modification" by not allowing Kimberly Larsen to carry Steven Larsen's Bi–Pap ventilator on board the vessel, and by not attempting to obtain a replacement Bi–Pap or allowing

Steven Larsen to do so after he discovered that his Bi–Pap was broken. Plaintiffs further contend that Carnival then required them to disembark the vessel based on his disability and not on neutral eligibility criteria, and that Carnival required Plaintiff to disembark through an inaccessible gangway. Kimberly Larsen also contends that she was improperly excluded from the cruise on account of her relationship with her husband.

In addition, Plaintiffs contend that during the check-in process at the Port of Miami, disabled passengers were improperly segregated from other passengers, in that disabled passengers used an elevator to reach the boarding ramp while other passengers were instructed to walk upstairs. Plaintiffs also complain that they initially were booked into an inaccessible cabin and that although Carnival relocated them to a wheelchair-accessible cabin, the new cabin was not in proximity to the rest of their group and that during the interval, Steven Larsen did not have access to an accessible restroom.

### 1. *Whether the Failure to Allow Plaintiffs to Carry the Bi–Pap On Board With Them Violated the ADA*

■ As noted above, Plaintiffs first maintain that Carnival violated Title III of the ADA in failing to allow them to carry the Bi–Pap on board with them. Plaintiffs instead checked the Bi–Pap with a curbside porter. Plaintiffs argue that the failure to make this reasonable modification

---

**4.** Although the Eleventh Circuit has not addressed the burden of proof applicable to Title III claims of failure to provide a reasonable modification, the majority of federal courts, including courts in the Southern District of Florida, follow the approach adopted by the

Fifth Circuit in *Johnson*. *See Access Now, Inc. v. South Fla. Stadium Corp.*, 161 F.Supp.2d at 1363 (Moore, J.); *Association for Disabled Ams., Inc. v. Concorde Gaming Corp.*, 158 F.Supp.2d 1353, 1363 (S.D.Fla. 2001) (Highsmith, J.)..

deprived them of the enjoyment of the goods, services and facilities offered by Carnival.

The Court finds that this claim fails because Plaintiffs cannot establish that it was *necessary* for Plaintiffs to carry on, rather than check in, the Bi–Pap in order to fully participate in the cruise. In fact, it is undisputed that for their September 2000 cruise, Plaintiffs checked-in the Bi–Pap, and no harm came to the ventilator, nor was Steven Larsen unable to participate in the cruise. Based on these undisputed facts, Plaintiffs cannot establish that carrying on the Bi–Pap, as opposed to checking it in, was necessary for Steven Larsen to travel on board the M/S Ecstasy.

### 2. Whether the Failure to Allow Plaintiffs to Obtain a Replacement Bi–Pap Machine Violated the ADA

■ Plaintiffs next argue that they were denied a reasonable modification because Carnival's onboard personnel allegedly did not agree to call their medical supplier, Lincare, or any other supplier, to obtain a replacement Bi–Pap machine, and did not permit them to make such a call themselves. Plaintiffs submit that Carnival should have simply required the ship to wait indefinitely until a replacement Bi–Pap was delivered before leaving port.

Defendant maintains that further delaying the ship potentially would have interfered with scheduled port stops on the cruise and the plans of other passengers for those port stops. Defendant argues that requiring it to modify its policies by having the ship wait indefinitely for a replacement Bi–Pap would constitute a fundamental alteration.

For their part, while Plaintiffs assert that it would not have been a fundamental alteration for the ship to wait for a replacement Bi–Pap machine, they cite no evidence as to how long the ship would have had to wait. Plaintiffs themselves observe that "it is almost impossible to determine exactly how fast a Bi–Pap machine could have been delivered because of the uncertainties of traffic." D.E. 64, at 13. After considering the record and the parties' arguments, the Court finds that requiring the ship to wait indefinitely before leaving port would constitute a fundamental alternation, and would not be required under the ADA.

Alternatively, Plaintiffs submit that the replacement Bi–Pap could have been delivered to Key West the next day, had Carnival made the request. However, as with their claim that the ship should have been held indefinitely, there is absolutely no evidence in the record to dispute that there was insufficient time for Lincare to set-up, pack and ship a replacement Bi–Pap machine for delivery in Key West the following morning. Rather, the record reflects that the earliest that Mr. Larsen's own medical supplier, Lincare, could deliver a replacement Bi–Pap machine to Key West was Wednesday morning, one day *after* the ship was scheduled to be in Key West. *See* Edmonds Dep. at Ex. A; Haughey Dep. at 26–28. On Wednesday morning, the ship was in Cozumel, Mexico. As such, Plaintiffs cannot establish that the failure to allow Plaintiff to obtain a replacement Bi–Pap machine violated the ADA.

### 3. Whether the Decision to Disembark Plaintiff For Medical Reasons Violated the ADA

■ Plaintiffs next claim that the decision to disembark Plaintiff for medical rea-

sons was discriminatory and based on impermissible stereotype. Plaintiffs argue that Carnival did not apply any neutral eligibility criteria to preclude him from participating in the cruise, and that he could not otherwise be excluded solely on the ground that he presented a "direct threat" to himself, and not to others. Carnival, on the other hand, argues that it applied neutral safety criteria in making the determination to disembark Plaintiff, and that there is ample evidence in the record to "warrant a legitimate concern for safety." *Theriault v. Flynn,* 162 F.3d 46, 46, n. 6 (1st Cir.1998).

Federal regulations issued by the Department of Justice under the ADA make it abundantly clear that while a public accommodation may not impose eligibility criteria that singles out persons with disabilities for exclusion, it may impose neutral eligibility criteria as a part of the screening process. Specifically, the regulations provide as follows:

> A public accommodation may, however, impose neutral rules and criteria that screen out, or tend to screen out, individuals with disabilities, if the criteria are necessary for the safe operation of the public accommodation. Examples of safety qualifications that would be justifiable in appropriate circumstances would include height requirements for certain amusement park rides or a requirement that all participants in a recreational rafting competition be able to meet a necessary level of swimming proficiency. Safety requirements must be based on actual risks and not on speculation, stereotypes or generalizations about individuals with disabilities.

56 Fed.Reg. 35544, 35564 (July 26, 1991), codified at 28 C.F.R. § 36.301(b); *see also* U.S. Department of Justice, ADA Title III Technical Assistance Manual, § III–4.1200.

Indeed, numerous courts have recognized that evidence of legitimate, non-discriminatory reasons for exclusion of individuals with disabilities precludes a finding of discrimination under the ADA. *See, e.g., Theriault v. Flynn,* 162 F.3d 46, 49 n. 6 (1st Cir.1998)(affirming summary judgment on a disability discrimination claim and noting that, "[a]bsent some evidence indicating that discrimination based on his disability animated the official, we think it sufficient for purposes of summary judgment that the record contains objective evidence that, beyond dispute, warrants a reasonable concern for safety . . ."); *Judice v. Hosp. Serv. Dist. No. 1,* 919 F.Supp. 978, 983–985 (E.D.La.1996) (finding no ADA violation in requiring alcoholic physician to undergo second evaluation prior to reinstatement of medical license, where requirement was not based upon generalized fears about alcoholics, but rather the reasonable judgments of a medical professional).

Plaintiffs submit that the regulations permitting public accommodations to impose neutral eligibility criteria, 28 C.F.R. § 36.301(b), are inapplicable to the present situation because there are no eligibility criteria for persons who use Bi–Paps. Plaintiffs submit that beyond neutral eligibility requirements (which they maintain are inapplicable), the only permissible reason to exclude him is if he posed a "direct threat" to the health and safety of others, 42 U.S.C. § 12182(b)(3), an exception which they claim also does not apply in this case. Accordingly, the Court will first consider the issue of whether Plaintiff was excluded based on neutral eligibility criteria and actual risks, as opposed to any stereotype.

Although Plaintiffs contend there are no eligibility criteria for those who use Bi–

Paps, it is undisputed that the eligibility criterion which Carnival does have, and which applies to *all* individuals sailing on Carnival vessels, is that sailing cannot not impose a critical risk to the individual's health. *See* Dr. Diskin Dep. at 15 (ship's physician will make decision on whether individual can sail based upon patient's physical condition and potential medical complications); S. Williams Dep. at 90–91.

Plaintiffs suggest that Carnival may not impose such eligibility requirements because they would solely deal with a person who had a disability and could not be neutral. The Court disagrees. The requirement that someone, by boarding a Carnival vessel, should not critically jeopardize their own health is a neutral criterion that applies to those who are disabled and those who are not. In fact, as Carnival notes, under this neutral standard, women in an advanced state of pregnancy are excluded from sailing. *See* Strawderman Dep., Ex. A, at 26 (Carnival Special Needs Desk Manual, stating that, for guest's safety, Carnival will not accept for passage a woman who is 28 weeks or more into her pregnancy). Pregnancy, of course, is *not* a disability under the ADA. *See, e.g., Walsh v. Food Supply, Inc.*, 1997 WL 401594, **1–2, 1997 U.S. Dist. LEXIS 9644, *3–4 (M.D.Fla. Mar. 19, 1997). Therefore, by excluding individuals solely on the basis of an imminent threat to their own health and safety, which standard applies both to individuals with disabilities and those (such as women in the late stages of pregnancy) without, Carnival applies exactly the kind of appropriate, neutral criteria envisioned in the regulations issued by the Department of Justice.[5]

In the instant case, it is absolutely clear, based upon undisputed, objective medical evidence in the record, that the decision to disembark Steven Larsen was based upon a reasonable concern for safety, rather than mere speculation, stereotypes, or generalizations about his disability. While Plaintiff conclusorily denies that he presented any risk to himself without a functioning Bi–Pap, Plaintiff simply cannot ignore the overwhelming medical testimony—including that of Plaintiffs' own treating physician—which plainly reveals otherwise. Indeed, the record reflects that all of the physicians who have testified in this case have opined that allowing Steven Larsen to sail without his Bi–Pap would have represented a serious threat to his health and even his life.

As observed by Defendant's expert, for a morbidly obese man with a history of severe obstructive sleep apnea and cardiac problems such as Steven Larsen, to embark on a cruise without a functioning Bi–Pap would have presented an extreme risk:

> And I think that given the patient's status, the fact that he had severe sleep apnea, very severe morbid obesity, history of chronic recurrent heart failure, obesity hyperventilation ... I think it would have been an extremely hazardous maneuver. And I think that there's a high chance that without either his oxygen or his Bi–Pap that Steven Lar-

---

5. Indeed, the examples cited in the federal regulations, such as a general height requirement for certain amusement park rides, or a swimming proficiency requirement for a rafting competition, make clear that it is permissible to use criteria reflecting a concern for an individual's safety. *See* 56 Fed.Reg. At 35564. The reason for excluding a person who cannot swim is, obviously, because participation by such a person would endanger his or her own health and safety.

sen would have decompensated and would either have become acutely ill and needed to be hospitalized or he could have died.

Dr. Benjamin Dep. at 21.

Similarly, the ship's physician, upon being informed that the Bi–Pap which Steven Larsen used every night to treat his sleep apnea was not functioning, and that Steven Larsen had almost died on five prior occasions, concluded that Steven Larsen had to be disembarked for his own safety and well-being. Moreover, Dr. Vardi, Steven Larsen's treating physician, testified that he would have made the *same* decision under the same circumstances:

> Q. Do you agree that [the ship's doctor's] decision to disembark Steven Larsen was a medically reasonable response to the information supplied to him that either Steven Larsen's Bi–Pap ventilator or oxygen concentrator were inoperative and that replacement equipment was unavailable?
>
> A. It's —— in a case it's unavailable, cannot supply it, its reasonable yes. *As I said, it's much better for the patient, it's safer for him not to travel if he doesn't have the equipment.*

Dr. Vardi Dep. at 70–71 (emphasis added). Dr. Vardi further elaborated:

> Most of the time, I'd rather—I'd rather that he use both [the Bi–Pap and the oxygen concentrator.] *It's better for him to use both of them all the time. At night. Every night.*

*Id.* at 30 (emphasis added).

Dr. Vardi also testified that he never recommended to Steve Larsen that it was acceptable to simply use the concentrator instead of the Bi–Pap at night. *See* Dr. Vardi Dep. at 30. Dr. Vardi stated:

> "I cannot say for sure that it is safe. This is a toss of a coin. When he is absolutely okay and doesn't have any infection, he could probably get by. But to say it's safe, it's a stretch."

*Id.* at 59. Indeed, Dr. Vardi had previously advised Steven Larsen that he should not sail if there were any problems with his medical equipment and unless he was "perfectly safe," and conditioned his approval for the January 2001 cruise on Steven Larsen bringing the medical equipment. *Id.* at 107–108.

Accordingly, after careful review of the parties' submissions and the relevant law, the Court finds that the disembarkation of Steven Larsen was based on neutral eligibility criteria and on actual, medically-recognized risks.

■ Notwithstanding the confluence of medical testimony concerning the risks to Plaintiff without a functioning Bi–Pap machine, Plaintiff argues that even if he was at risk without a functioning Bi–Pap machine, it was unreasonable for Carnival to disembark him without first contacting Dr. Vardi, Plaintiff's physician, so that Dr. Vardi could explain to the ship's medical personnel how to adjust the on-board ventilator to assist Plaintiff during sleep.

Based on the evidence in the record, however, Plaintiffs cannot show that the medical staff on the ship would have been able to safely adjust the existing on-board ventilator to serve as the functional equivalent of the broken Bi–Pap. The Court declines to find that such a modification is reasonable or required by the ADA, as it is predicated on the entirely speculative assumption that *if* Dr. Vardi could be reached, the medical staff *may* be able to adjust the existing on-board ventilator so that *perhaps* it may be used by Plaintiff as

the functional equivalent of a Bi–Pap, at least until such time as a replacement Bi–Pap was delivered to the ship, *if* such a replacement could be obtained. Plaintiffs have pointed to no facts which would support their contention that such a modification could adequately address the patently obvious and undisputed medical risk to Plaintiff of traveling without a functioning Bi–Pap. As such, the Court concludes that under the circumstances presented here, Plaintiffs' proposed modifications were not reasonable, and were not required under Title III of the ADA.[6]

### 4. *Whether Carnival Violated the ADA With Respect to Plaintiffs' Remaining Allegations*

■ Plaintiffs contend that Carnival violated the ADA when Steven Larsen was separated for a brief period of time from the rest of his group during the check-in process. The Larsens' complaint is essentially that Mrs. Larsen was not permitted to take the elevator with Steven Larsen, like she had been able to during the September 2000 cruise, and that she was briefly (for one floor, for a few minutes) separated from him. *See* Larsen Dep. at 153–156. However, given the undisputed fact that individuals with disabilities were given priority use of the elevator while other able-bodied passengers used the stairs, and that the Larsens had to be segregated because Steven Larsen could not have possibly taken the stairs, the Court finds no violation of Title III, and concludes that

the brief separation was appropriate and not the type of separation or segregation of disabled persons that the ADA forbids.

■ Second, Plaintiffs maintain that they were discriminated against in the booking or cabin assignment process. However, there is absolutely no evidence in the record that Carnival failed to follow the same booking process for Plaintiffs as for other groups, or that Carnival intentionally booked the Larsens away from the rest of their group. Indeed, Steven Larsen concedes that the cabin he initially was assigned, Cabin E116, was located along the same row of cabins and on the same floor as other individuals in his group except for his daughter, who made her booking late. The first time Carnival received any indication that Cabin E116 was inaccessible to Steven Larsen was after the Larsens had already boarded.[7]

Moreover, despite being moved at their own request, Plaintiffs complain that the second cabin to which they were assigned, Cabin M298, was "too far away" from the other members of their group and believe that it was "inferior" to Cabin E116. *See* Larsen Dep. at 163. Plaintiffs readily admit, however, that the new cabin was larger and provided greater accessibility for Steven Larsen. Thus, the Court finds that Carnival accommodated Steven Larsen's disability in switching the rooms, rather than discriminated against him. Consequently, Plaintiffs simply cannot show that they were discriminated against in any way with respect to their group booking

---

**6.** In view of the Court's finding, the Court need not consider the parties' respective arguments concerning the applicability of the "direct threat" exception.

**7.** It is undisputed that Steven Larsen was initially assigned Cabin E116, a cabin that had been modified to provide greater accessi-

bility than a standard cabin. Further, Carnival's booking records indicate that Steven Larsen was provided information about the dimensions of his cabin. At no time prior to embarkation did Steven Larsen notify Carnival that Cabin E116 would not accommodate his needs.

and cabin assignment, and/or denied the full and equal enjoyment of the services and facilities offered by Carnival on the M/S Ecstasy.

Plaintiffs also appear to complain that Title III was violated because Steven Larsen was not allowed to use a restroom during the period in which Carnival was arranging for an alternate cabin. However, the Court finds that this claim fails because Steven Larsen does not allege that he needed to use a restroom or that he specifically asked to use a restroom. He merely mentioned that "it was getting close" to the time when he would need to use a restroom, and did not ask to use a restroom, but rather only asked Carnival employees *where* accessible restrooms were located. K. Larsen Dep. at 63. The Court finds no ADA violation here. Carnival simply could not have refused Plaintiff access to a restroom, where Plaintiff never asked to use any restroom, either on or off the vessel.

■ Next, the Larsens claim that they were threatened with Jones Act fines if they refused to disembark, on the basis of Mr. Larsen's disability and/or in retaliation for exercising their rights under the ADA. However, because the Court finds that the decision to disembark did not violate the ADA, it necessarily follows that advising the Plaintiffs of possible fines for the failure to disembark—fines which Plaintiffs undisputedly faced if they refused to disembark—cannot constitute discrimination or retaliation under the ADA.

■ Plaintiffs also argue that they were discriminated against in being disem-

barked off the crew gangway rather than the passenger gangway through which they originally embarked. At the time the Larsens were ready to disembark, the passenger gangway already had been withdrawn in preparation for departure. Consequently, the only means of disembarkation for any passengers or crew was via the crew gangway. Thus, contrary to Plaintiffs' assertion that Carnival "needlessly exposed Steven Larsen to inaccessible elements of the vessel ... when accessible elements were readily available," the Court finds that this claim fails, as it is undisputed that the crew gangway was the only available route to disembark the ship at that time. Accordingly, Plaintiffs cannot establish a violation of Title III on these facts.[8]

■ Finally, Plaintiffs cannot establish that Kimberly Larsen was subjected to unlawful discrimination based upon her association with Steven Larsen because there is no evidence demonstrating that an adverse action was, in fact, taken against her. *See, e.g., Dollinger v. State Ins. Fund,* 44 F.Supp.2d 467, 480 (N.D.N.Y. 1999); *Lester v. Compass Bank,* No. 96–AR–0812–S, 1997 WL 151782, **2–3, 1997 U.S. Dist. LEXIS 11575, *8 (N.D.Ala. Feb. 10, 1997). Kimberly Larsen was never asked to leave the ship, and in fact, was told that she could stay. Therefore, without proof of an adverse action directed against Kimberly Larsen, Plaintiffs fail to make a prima facie case for associational discrimination. In any event, in view of the Court's holding that there was no discrimination against Steven Larsen, it would appear that Kimberly Larsen's de-

---

**8.** Moreover, to the extent that Plaintiffs' claim concerning the crew gangway is one involving the design, construction or physical accessibility of the M/S Ecstasy, such a claim is precluded by the class settlement discussed above in *Access Now, Inc. v. Cunard Line Limited, Co.,* No. 00–7233–Civ–Moreno, 2001 WL 1622015 (S.D.Fla.2001)

rivative claim for associational discrimination must also be denied.

### C. *Plaintiffs' State–Law Claims*

The Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction. *See* 28 U.S.C. 1367(c)(3). Having dismissed Plaintiffs' federal claims, the Court declines in its discretion to exercise supplemental jurisdiction over the state-law claims. Accordingly, the remaining state-law claims are dismissed, without prejudice.

### IV. *CONCLUSION*

The undisputed testimony of the ship's doctor, ship's nurse, Plaintiff's own treating physician and defendant's medical expert all confirm that permitting Steven Larsen to sail without a functioning Bi–Pap would have posed an unacceptable risk to his very life, and that the medical disembarkation of Steven Larsen was a sound and reasonable medical decision, and not an unlawful act of discrimination based upon Steven Larsen's disability. For these and the other reasons discussed above, Carnival is entitled to summary judgment in its favor with respect to Count II, for violations of Title III of the ADA.

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (D.E.68) is **GRANTED IN PART**, as follows:

1. Count II is hereby DISMISSED with prejudice.

2. Counts III–X are hereby DISMISSED without prejudice. It is further

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Partial Summary Judgment (D.E.64) is **DENIED**. It is further

**ORDERED AND ADJUDGED** that this case is CLOSED for administrative purposes, and all remaining pending motions are **DENIED** as moot.