*Williams v. Central Vermont Med. Ctr., Inc.*, No. 206-4-14 Wncv (Tomasi, J., June 10, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## VERMONT SUPERIOR COURT

| | |
|---|---|
| SUPERIOR COURT<br>Washington Unit | CIVIL DIVISION<br>Docket No. 206-4-14 Wncv |

Xenia Williams,
  Plaintiff,

v.

Central Vermont Medical Center, Inc.,
  Defendant.

### Opinion and Order on Defendant's Motion for Summary Judgment

This case arises out of a primary care physician's failed attempt at persuading a patient on long-term, high-dose opioids to sign a Patient's Controlled Substance Agreement Informed Consent form as a condition to continued opioid treatment. The patient, Plaintiff Xenia Williams, was offended by the content of the form and took the position that she should be able to use her own self-styled agreement as an accommodation for her disability. The physician, Joseph Brock, M.D., interpreted Ms. Williams comments as a threat to sue him and allegedly terminated their doctor–patient relationship.

Ms. Williams now seeks damages from Defendant Central Vermont Medical Center, Inc. (CVMC), Dr. Brock's employer, pursuant to Vermont's Public Accommodations Act (PAA), 9 V.S.A. §§ 4500–4507, for discrimination (not making a reasonable modification in policies) and retaliation (termination of the doctor–patient relationship and CVMC's response to it), and for negligence due to rudeness

and failure to follow certain guidelines regarding her care.[1]  CVMC has filed a

motion for summary judgment on all four claims.

1.      *Summary Judgment Standard*

Summary judgment is appropriate if the evidence in the record, referred to in

the statements required by Vt. R. Civ. P. 56(c)(1), shows that there is no genuine

issue as to any material fact and that any party is entitled to a judgment as a

matter of law.  Vt. R. Civ. P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994).

The Court derives the undisputed facts from the parties' statements of fact and the

supporting documents.  *Boulton v. CLD Consulting Engineers*, Inc.*,* 2003 VT 72,

¶ 29, 175 Vt. 413, 427.  A party opposing summary judgment may not simply rely on

allegations in the pleadings to establish a genuine issue of material fact.  Instead, it

must come forward with deposition excerpts, affidavits, or similar evidence to

establish such a dispute.  *Murray v. White*, 155 Vt. 621, 628 (1991).

2.      *The Undisputed Facts*

The basic material facts are undisputed for summary judgment purposes.

Ms. Williams has been prescribed very high-dose opioids for many years for pain

relief related to an arthritic condition.[2]  In 2009, the doctor who then was

prescribing those opioids was leaving the area, the other physicians in the doctor's

---

[1] Initially, Ms. Williams sued Dr. Brock as well.  She withdrew her claims against him when she learned in the course of discovery that he was an employee of CVMC. In the complaint, she proceeded under both the Americans with Disabilities Act (ADA) and Vermont's PAA.  She withdrew her ADA claims in the course of summary judgment proceedings.

[2] The specific opioids prescribed to Ms. Williams have varied over the years.

2

practice group would not continue prescribing opioids to Ms. Williams, and her care was transferred to Dr. Brock. He was one of the few remaining doctors in Central Vermont at the time who was willing to provide this sort of treatment on a long-term basis. Dr. Brock tapered the level of opioids Ms. Williams was taking down somewhat and otherwise was willing to continue prescribing them to her and did for some time. At no time did he come to believe that she was exhibiting behaviors indicative of abuse.

Dr. Brock's practice group, or CVMC generally, required patients on long-term opioid treatment, and doctors prescribing it, to sign a form dubbed: Patient's Controlled Substance Agreement Informed Consent (CSA). The CSA is a "form" agreement developed by CVMC personnel (not Dr. Brock) that plainly is designed to protect patient and public safety in light of the now-infamous risks presented by opioids, particularly long-term prescriptions for them. Requiring patients to execute controlled substance agreements as a condition to long-term opioid treatment is a "best practice" in the medical profession. Despite this, Dr. Brock did not initially have one in place for Ms. Williams.

At one point, Ms. Williams needed a new (or renewed) prescription, but Dr. Brock was out of town. She was unable to get it from the other physicians in Dr. Brock's practice group. This appears to have occurred for several reasons, including the lack of having a signed CSA from Ms. Williams. Dr. Brock resolved to have Ms. Williams execute the CSA.

3

At a subsequent appointment, he asked her to sign the form. She would not execute the form at that appointment because she wanted more time to look it over. Dr. Brock gave her a copy to take home, evidently with the understanding that she would review it at her leisure and mail it back in signed, which she never did.

Ms. Williams found the language of the CSA offensive because, in her view, it was framed as though she were a drug addict or criminal, and some of its terms were irrelevant (such as the provision requiring a patient to notify the doctor of a pregnancy). At her next appointment, she presented Dr. Brock with a five-page handwritten document entitled, "Point by Point Response to Controlled Substance Agreement." It is a list of her subjective reasons for disagreeing with provisions of the CSA and finding it offensive.

She also produced her own handwritten statement, entitled, "Xenia Williams Controlled Substance Agreement," that she wanted to use instead of the CSA. In the statement, she explains that she has post-traumatic stress disorder (PTSD) caused by sexual abuse and incest and being required to sign the "draconian" CSA at the insistence of someone who claims to have her best interests in mind is "triggering and retraumatizing." The statement ends with a request to use her statement instead of the CSA as an accommodation under the ADA.

While Ms. Williams' statement includes an aspirational promise to be responsible with opioids, it does not include any provisions analogous to those of the CSA, which would help protect patient and public safety if some kind of problem were to develop.

4

As Ms. Williams and Dr. Brock discussed this matter, things did not go well. While there is some dispute about exactly who said what, it is clear that Ms. Williams was claiming the right to use her own statement and had little interest in signing the CSA, which she never did. Dr. Brock was willing to make some modifications to the CSA, but he was not going to accept her statement as an effective substitute for it. Ultimately, he was unable to persuade her to sign the CSA. The appointment ended when Ms. Williams said something (precisely what is disputed) about the ADA. Dr. Brock interpreted whatever she said to mean that she was going to sue him. He said that this would be an untenable breach of trust between doctor and patient. He then gave her a 30-day tapering prescription for opioids, agreed to see her for any emergencies during those 30 days, and otherwise terminated their relationship.[3]

Following this, Ms. Williams filed an administrative complaint about Dr. Brock with CVMC and asked it to do what she characterizes as an "ethics consult." CVMC reported that it did not find that Dr. Brock did anything wrong and took no further action.

After the relationship with Dr. Brock ended, Ms. Williams was unable to find a doctor who would prescribe long-term opioids for her. Eventually, she became a

---

[3] There is also a lurking dispute of fact concerning this point. Dr. Brock insists that, after she refused to sign the CSA, he told Ms. Williams that he could not prescribe opiates to her but that he could continue to be her primary care doctor, and only later terminated her from his practice. Ms. Williams insists that he immediately terminated her from all aspects of his practice. For purposes of the present motion, the Court must assume that Dr. Brock terminated her from all aspects of his practice.

patient at Dartmouth Hitchcock Medical Center's Pain Clinic. She signed its version of a controlled substances agreement and began receiving opioids again. She violated the agreement and lost access to opioids, however. At some point later, she became a patient at Gifford Medical Center. She signed its version of a controlled substances agreement and has been receiving opioid treatment through it ever since.

3. *The Claims*

Ms. Williams asserts, in effect, that something about her PTSD precluded her from signing the CVMC CSA (she does not explain how she was able to sign the Dartmouth and Gifford CSAs). She claims that Dr. Brock should have accepted her handwritten statement as a "reasonable accommodation" or should have further engaged in the "interactive process" with her to see if she could be persuaded to sign the CSA. She characterizes the episode in which Dr. Brock tried to persuade her to sign the CSA as discrimination in a place of public accommodation in violation of the PAA. She claims that his termination of their relationship *and* CVMC's failure to take any action against Dr. Brock were incidents of retaliation against her for having asserting her rights. She further claims that Dr. Brock, in their exchanges about the CSA, was disrespectful, rude, and did not follow professional standards. That conduct, she asserts, amounts to negligence.

4. *Discrimination*

Ms. Williams alleges that she has PTSD caused by childhood sexual abuse. It is not clear that she actually has ever been diagnosed with PTSD, but CVMC

6

accepts for summary judgment purposes that she has PTSD and that her condition

is a disability. Neither party, however, has focused on what major life activity Ms.

Williams' PTSD limits and exactly how any such limitation relates to the events of

this case.[4] *See* 9 V.S.A. § 4501(2)(A). Ms. Williams generally claims that she has

sensitivities about matters of trust and somehow this caused her to resist signing

the CSA, even though it was a form agreement intended for all patients receiving

opioids on a long-term basis. The parties did not flesh out this aspect of Ms.

Williams' claim, however, so the Court will not dwell on it.

The PAA bars a public accommodation from denying the benefits of its

---

[4] For instance, Ms. Williams objected to the provision of the CSA that alerted the patient to the need to notify the doctor of any pregnancy. The provision was irrelevant in her case because she was unable to become pregnant. Obviously, the provision would be irrelevant to men and all women who are unable to become pregnant. Like the other provisions of the CSA, this one is not there because anyone suspected that Ms. Williams or anyone else who is unable to become pregnant might somehow become subject to that condition. It is there for those patients who are able to become pregnant. It is wholly unclear what limitation it is that Ms. Williams' PTSD causes that, in turn, made this provision controversial to her. The point of providing reasonable accommodations (Title I) or modifications to policies (Title III) is to help the disabled person overcome *the limitation* caused by the disability. *See, e.g., Gammage v. West Jasper Sch. Bd. of Educ.*, 179 F.3d 952, 955 (5th Cir. 1999) ("[T]he ADA does not require an employer to assume that an employee with a disability suffers from a limitation; as a result, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom."); *accord Adams v. Rice*, 531 F.3d 936, 944 (D.C. Cir. 2008); *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003) ("Put another way, there must be a causal connection between the major life activity that is limited and the accommodation sought.); *Felix v. N.Y. City Transport Authority*, 324 F.3d 102, 107 (2d Cir. 2003). Without spelling out the limitation at issue, determining whether an accommodation or policy modification is reasonable and necessary in a case such as this can be a murky endeavor. The disability, at least when the limitations it causes are not obvious, alone is insufficient to entitle one to the accommodation or modification.

services to persons with disabilities.  9 V.S.A. § 4502(c).  This encompasses the obligation to make "reasonable modifications" to policies and procedures when doing so does not "fundamentally alter" the nature of the goods or services offered.  *Id.* § 4502(c)(5).  There is no dispute that Dr. Brock's office is a place of public accommodation and that the services of a physician are subject to these provisions.

The relevant provisions of the PAA generally are construed to be consistent with the analogous provisions of the ADA (except with regard to remedy).  *See* 9 V.S.A. § 4500(a).  The analogous provisions of the ADA are located at 42 U.S.C. §§ 12181–12189 (Title III).  Similar to the PAA, the ADA bars a public accommodation from denying a disabled person the opportunity to participate in its services.  *See* 42 U.S.C.A. § 12182(b)(1)(A)(i).  This may require it "to make reasonable modifications in policies, practices, or procedures, *when such modifications are necessary* to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C.A. § 12182(b)(2)(A)(ii) (emphasis added).

At the outset, the Court notes that Ms. Williams' attempt to characterize her claim as a failure to provide a "reasonable accommodation" or a failure to engage adequately in an "interactive process" is not helpful.  "Reasonable accommodation" and "interactive process" are terms of art peculiar to circumstances involving employment relationships (Title I of the ADA).  While there clearly is conceptual

8

overlap between a reasonable accommodation (Title I) and a modification to a policy (Title III), and a public accommodation may need to engage in some back-and-forth to know whether and how to modify its policies, these concepts are not necessarily co-extensive. Ms. Williams has produced no authority to the effect that they should be treated as such in a case like this, where access to a service is the issue rather than the fairness of an employment relationship.

In any event, the Court perceives no viable discrimination claim under the PAA and, by analogy, Title III of the ADA. The opportunity for Ms. Williams to receive medical services from Dr. Brock not only was available to her, they already had an ongoing doctor–patient relationship. There was no denial of any opportunity to participate in the physician services provided at Dr. Brock's office. Ms. Williams has come forward with no authority, and the Court has found none, to the effect that a patient in an ongoing physician–patient relationship, by invoking her disability rights, has any entitlement to determine the way the physician exercises his professional judgment on issues of a medical nature. *Cf. Webster Bank v. Oakley*, 830 A.2d 139, 161 (Conn. 2003) ("the plaintiff is not required to modify its default and foreclosure policies and procedures pursuant to [Title III], because the ADA operates to afford equal access to goods, services, facilities, privileges, advantages and accommodations, but does not regulate the content of such goods, services, facilities, privileges and advantages"). Again, this is not a case in which Dr. Brock's care was unavailable to Ms. Williams; she had access. Her contest focuses on the content of that care. *Cf.* Nondiscrimination on the Basis of Disability

9

by Public Accommodations and in Commercial Facilities, 56 FR 35544-01 (Title III "would not require the inventory of goods provided by a public accommodation to be altered to include goods with accessibility features. For example, [it] would not require a bookstore to stock Brailled books or order Brailled books, if it does not do so in the normal course of its business.").

If there were some way to characterize Ms. Williams' refusal to sign the CSA as a request to deviate from a policy due to some limitation created by Ms. Williams' PTSD to make Dr. Brock's continued services available, then her claim still fails. There is no showing on this record that the deviation actually was necessary. However much she disliked the CSA, she was able to sign the CSAs required by other medical providers. *See, e.g., Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1344 (S.D. Fla. 2003) (no showing that carrying medical device onboard cruise ship rather checking with porter was necessary for ADA purposes where traveler was able to check it on other cruise and fully participate in activities).

More importantly, the summary judgment record establishes that the CSA was required as a matter of professional judgment by CVMC to regulate prescriptions of opioids and protect patient and public safety. The only expert evidence provided in this case proves that the CSA was, at minimum,[5] a best

---

[5] It appears that the bulk of the provisions of the CSA have now become mandatory under Vermont law. *See* Vermont Department of Health, Rule Governing the Prescribing of Opioids for Chronic Pain 5.3.1, 5.3.2, available at http://healthvermont.gov/regs/documents/opioids_prescribing_for_chronic_pain_rule.pdf. Rule 5.3.2 specifically requires the prescriber to obtain a signed "Controlled Substance Treatment Agreement" that shall include other requirements as determined by the prescriber, such as directly observed urine drug testing and

10

practice of the profession. *See* Deposition of Gilbert J. Fanciullo 38, exh. J to Defendant's Motion for Summary Judgment (filed Jan 7, 2016). The record establishes that exempting Ms. Williams from signing the form would have been a fundamental alteration to the nature of the service being provided by CVMC. Ms. Williams has provided no countervailing evidence on that point. The PAA and ADA simply do not require a provider to make such alterations to what they believe are proper professional standards. so long as that judgment is not being used to mask discrimination. *Cf. Class v. Towson University*, 806 F.3d 236, 246–47 (4th Cir. 2015) (deferring to professional judgment of physician employing health-and-safety requirement applicable to would-be student athlete as nondiscriminatory under ADA); *Falchenberg v. New York State Dep't of Educ.*, 642 F. Supp. 2d 156, 165 (S.D.N.Y. 2008), *aff'd,* 338 F. App'x 11 (2d Cir. 2009) ("Where a program is designed to 'achieve definite pedagogical objectives,' this Court will not 'substitute its judgment for that of experienced education administrators and professionals in assessing whether the program does in fact meet its pedagogical objectives.'" (quoting *Maczaczyj v. New York*, 956 F. Supp. 403, 409 (W.D.N.Y.1997))).

Lastly, Ms. Williams also asserts that Dr. Brock did not engage in the "interactive process" that applies to Title I claims. 29 C.F.R. § 1630.2. To the extent the proposed changes would have required him to alter his fundamental professional judgment, the Court does not believe negotiations were required.

pill counts to reasonably and timely inform the prescriber if the patient is misusing the prescribed substance."

11

Further, as noted in the employment context, the failure of an employer to engage in the interactive process cannot, by itself, establish liability. *See State v. G.S. Blodgett Co.*, 163 Vt. 175, 184 (1995); *McBride v. BIC Consumer Products Mfg. Co.*, 583 F.3d 92, 100 (2d Cir. 2009). In any event, while the record is not clear as to what alterations he would agree to, it is undisputed that Dr. Brock was willing to make some minor changes to the CSA for Ms. Williams. See Deposition of Xenia Williams 90, 93, exh. C to Defendant's Motion for Summary Judgment (filed Jan 7, 2016) (acknowledging Dr. Brock's willingness to change the pregnancy notification requirement and the requirement to bring unused medicine to appointments). Accordingly, if interaction was required, it was completed.

5.     *Retaliation—Dr. Brock*

The failure of Ms. Williams' discrimination claim does not dispose of the retaliation claim arising out of Dr. Brock's conduct. CVMC argues that ample authority supports Dr. Brock's position that a patient suing, or taking other similar action against, her doctor creates a conflict of interest for both patient and doctor that makes the ongoing relationship untenable. The problem with this argument on summary judgment, however, is that it requires a finder of fact to draw the proffered inference. Ms. Williams avers that Dr. Brock terminated their relationship when Ms. Williams brought up the ADA. While a finder of fact certainly could conclude that he did so precisely for the reasons he cites, it could also infer that he did so because Ms. Williams was trying to press her disability rights. The Court has no way to make a ruling on this issue as a matter of law on

12

summary judgment. It must be sorted out at trial. Indeed, while it may be true that a threat to sue would likely adversely impact the doctor–patient relationship, a defendant cannot be permitted to use that natural circumstance as an artifice to insulate illegal discrimination.

CVMC next argues that the retaliation claim still should not go forward because Ms. Williams cannot prove damages. This is so, it argues, because the only harm Ms. Williams could have suffered was the loss of access to opioids for a time and that was a function of her refusal to sign the CSA. She alleges, however, that the episode distressed her greatly and caused her to need to seek out other opioid-prescribing physicians. She provided additional evidence as to emotional and other damages at the hearing on this motion. Whether there is a causal connection between such claimed damages and the alleged retaliation is an issue that is not raised in the instant motion. For present purposes, her sworn assertions of damage stemming from the alleged retaliation is sufficient to defeat the motion for summary judgment.

6. *Retaliation—CVMC*

Ms. Williams claims that the retaliatory actions against her continued when she filed an administrative complaint with CVMC, and it took no action against Dr. Brock. Ms. Williams' contact with CVMC administrators in this regard is not well developed in the factual record, and her claim is not well addressed in briefing. It is clear that she filed some sort of complaint, and it is equally clear that CVMC undertook some kind of investigation in response, found no wrongdoing, and took no

13

further action.  That is all.  As a matter of law, these facts do not permit any reasonable inference of retaliation.

7.    *Negligence*

Ms. Williams' negligence claim also is not well developed in the factual record or the briefing.  She alleges that in the course of her interactions with Dr. Brock about the CSA, he was rude and made "hurtful" statements.  She believes that those statements violated a physician's responsibility for being polite and respectful and amounts to negligence.  At the motion hearing, she also asserted that his conduct violated various AMA and CVMC ethical guidelines.  In briefing, she cites generally to the AMA Code of Medical Ethics Opinions barring doctors from declining to accept (which did not happen here) patients due to invidious discrimination and from placing their own financial interests above those of their patients.[6]

To prevail in all but the most obvious cases of professional neglect, a plaintiff must come forward with expert evidence to establish the appropriate level of care.  *See Senesac v. Associates in Obstetrics & Gynecology*, 141 Vt. 310, 313 (1982).  Ms. Williams has failed to do so in this case.  Her citation of the AMA and CVMC ethics guidelines and AMA ethics opinions cannot take the place of such evidence.  Many professional organizations promulgate aspirational codes that they hope their

---

[6] Ms. Williams' invocation of "financial interests" appears to be an oblique reference to the claim that Dr. Brock wanted her to sign the CSA to protect his medical license given the potentially controversial nature of the sort of prescriptions at issue.

14

members will follow.  Such precatory guideposts may be relevant, but they are insufficient on their own to establish a legal standard of care.  *See Desimini v. Durkin*, No. 14-CV-112-JD, 2015 WL 3408749, at *3 (D.N.H. May 27, 2015); *Bala v. Powers Ferry Psychological Associates*, 491 S.E.2d 380, 381 (Ga. Ct. App. 1997).

Since Ms. Williams has not come forward with any expert testimony demonstrating an applicable standard of care and how Dr. Brock is alleged to have breached it, Defendant is entitled to summary judgment as to the negligence claim.

For the foregoing reasons, CVMC's motion for summary judgment is granted on all claims except retaliation in violation of the PAA arising out of Dr. Brock's alleged decision to terminate the doctor–patient relationship.

Dated this __ day of June, 2016, at Montpelier, Vermont.

_____
Timothy B. Tomasi,
Superior Court Judge

15